2019 IL App (1st) 181698

THIRD DIVISION
September 25, 2019

No. 1-18-1698

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| EDWARD SHROCK and BABY SUPERMALL, LLC, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 16 L 11404 |
| | ) | |
| UNGARETTI & HARRIS LTD., NIXON PEABODY LLP, JOHN RUSKUSKY, and STANTON B. MILLER, | ) ) ) | |
| Defendants-Appellees. | ) ) ) | Honorable Patricia O. Sheahan, Judge Presiding. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    In November 2016, plaintiffs, Edward Shrock and Baby Supermall, LLC (BSM), sued the law firms Ungaretti & Harris Ltd. (Ungaretti) and Nixon Peabody LLP (Nixon Peabody) (with whom Ungaretti merged) and two of their attorneys, John Ruskusky and Stanton B. Miller. The crux of Shrock's complaint was that defendants aided and abetted one of their clients, Robert Meier, in violating an injunction that Shrock obtained against Meier. The circuit court dismissed Shrock's lawsuit, among other reasons, as time-barred under the two-year statute of limitations

applicable to actions against attorneys for conduct arising from their rendition of professional services. We affirm.

¶ 2                                   BACKGROUND

¶ 3     We draw our facts from two sources. First, the allegations of the second amended complaint, which we take as true at the pleading stage. See *Goral v. Dart*, 2019 IL App (1st) 181646, ¶ 6. We also judicially notice various filings in the underlying cases that prompted this lawsuit, as well as pleadings in this lawsuit. See *People v. Davis*, 65 Ill. 2d 157, 164 (1976).

¶ 4     Because of the issue involved, it is necessary to specifically detail several acts that took place and the dates on which they occurred.

¶ 5             I. Actions Leading Up to Shrock's Lawsuit Against Meier

¶ 6     Plaintiff BSM, an Internet retailer of baby products, is an Illinois limited liability company that was formed in October 2003. BSM is a manager-managed limited liability company with a single manager, Robert Meier, and three members: Meier, plaintiff Shrock, and Baby Supermall, Inc., a corporation of which Shrock was president.

¶ 7     Among its many provisions, BSM's operating agreement granted extraordinarily broad powers to its manager, Meier. Specifically, section 6.1.2 of the agreement gave Meier

> "full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs."

¶ 8     Eventually, Meier came to own 87.5% of BSM, and Shrock owned the remaining 12.5% stake in BSM. According to Shrock, at some point, Meier offered to buy Shrock's 12.5% share, but Shrock was unwilling to sell.

¶ 9 As Shrock tells it, a campaign of retribution ensued: First, Meier reduced Shrock's salary from $75,000 to $40,000. Then Meier *increased* his own salary, from $150,000 to $300,000. And to boot, Meier refused to let Shrock participate in any corporate decision-making.

¶ 10 More problematically, and more pertinent to this case, Meier created a series of agreements that he referred to as "profit sharing" agreements. Under these agreements, BSM, acting through Meier, in his capacity as BSM's manager, and Meier, acting in his individual capacity, agreed that BSM would pay Meier a higher percentage of its profits in exchange for Meier's agreement to defer his salary and guarantee BSM's debts and expenses. According to Shrock, the purpose of these so-called "profit sharing" agreements was to zero-out BSM's balance sheet to ensure that BSM had no profits.

¶ 11 BSM then hired Meier's wife and stepson and paid them 20% and 10% of BSM's profits, respectively—actions that Shrock alleged violated Illinois law and the operating agreement.

¶ 12 II. The 2009 Lawsuit: Shrock Sues Meier for Breach of Fiduciary Duty

¶ 13 In 2009, Shrock sued Meier for breach of fiduciary duty in the circuit court of Cook County (the 2009 Lawsuit). Defendants Ruskusky and Stanton, attorneys at defendant Ungaretti, represented Meier.

¶ 14 A. The 2010 Injunction Against Meier

¶ 15 On May 18, 2010, after finding a likelihood that Meier had breached his fiduciary duty to Shrock, the circuit court entered an injunction against Meier. Relevant here, the order did two things: (1) it barred Meier from making any further payments to himself, his wife, or his son under the guise of "profit sharing," and (2) it limited Meier from paying himself, his wife, or his son salaries in excess of $350,000, $120,000, and $110,000, respectively.

¶ 16    About 10 months later, Shrock filed a second motion for an injunction to enjoin Meier from paying himself "profit sharing," after Meier allegedly drew down BSM's line of credit by $700,000 to purchase a house. On March 24, 2011, attorneys with Ungaretti responded to that motion by telling the circuit court there was "no basis for an injunction based upon plaintiff's latest baseless allegations."

¶ 17    Then, in May 2012, Shrock filed a motion for a receiver, in which he alleged that Meier "may be" violating the injunction. In response, Meier (through Ruskusky) denied that allegation and insisted that Meier had not taken any profit sharing since the injunction was entered.

¶ 18    In August 2012, Shrock filed a petition for rule to show cause against Meier, alleging that he was again violating the injunction. In response, Meier (through Ruskusky) argued that Meier was merely " 'accruing' " money, not actually paying it out.

¶ 19    In May 2013, Shrock brought another petition for rule to show cause against Meier. In response, Ruskusky told the court, " 'I assure you that Mr. Meier has fully complied with all court orders.' "

¶ 20    In June 2013, Meier filed a motion to modify the injunction. Meier included an affidavit drafted by Ruskusky, in which Meier swore that he had not made any payments under the profit-sharing plans since the injunction went into effect. Instead, he claimed that amounts owed to Meier, his wife, and his son by virtue of the profit-sharing agreements had merely " 'accrued.' "

¶ 21                          B. Shrock's August 2, 2013, Filing

¶ 22    On August 2, 2013, Shrock filed an opposition to Meier's request to modify the injunction. In it, Shrock again argued that Meier had repeatedly violated the injunction by "just reclassify[ing] the profit sharing as 'bonuses,' 'loans,' and alike." Shrock quoted statements made by Meier's attorney, defendant Ruskusky, to the court: " 'I assure you,' Ruskusky

4

responded, 'Mr. Meier has fully complied with all Court Orders.' All Mr. Meier did was 'accrue the amounts,' Ruskusky went on, let 'Shrock produce documents to back up his claims.' "

¶ 23   Shrock did provide backup, he wrote in this filing, via W-2s from Meier, his wife, and stepson, along with other financial data on which Shrock's expert relied to "verify [that] Meier and [his wife and stepson] pocketed the money." In the face of that evidence, Shrock's filing claimed, defendant Ruskusky "reversed his stance. Yes, Meier did pay out these amounts, Ruskusky admitted, but 'they were not profit-sharing payments barred by the injunction but bonuses and salary increases.' "

¶ 24   The filing quoted the court: " 'I though[t] you told me all Mr. Meier did was accrue these payments and did not pay them out,' the Court said, 'that was my Order.' You're claiming now that 'they made several hundred thousand dollars in bonuses and salary increases over a couple of years?' the Court asked." Shrock wrote that "[t]he Court didn't buy Ruskusky's claims."

¶ 25   Shrock thus requested "an Order of default against Meier and a Rule to Show Cause against him and Ruskusky." In his prayer for relief, Shrock asked, among other things, that the court "sanction[ ] Meier, Ruskusky, and Ungaretti & Harris."

¶ 26                              C. Shrock Prevails at Trial

¶ 27   On March 5, 2014, the jury found that Meier willfully and wantonly violated his fiduciary duties to Shrock and assessed over $10 million in punitive damages.

¶ 28                              D. Shrock's March 12, 2014, Filing

¶ 29   On March 12, 2014, Shrock filed a motion again claiming a violation of the injunction. As in his August 2013 filing, Shrock claimed that, post-injunction, Meier (1) used BSM's line of credit for a $788,000 loan to buy a house; (2) paid his wife and son $682,921 and 667,485, respectively, that he deceptively mislabeled as "bonuses"; and (3) paid himself $4,047,636 above

his $350,000 salary. He reiterated that he had provided evidence to prove, contrary to Ruskusky's assertions, that Meier and his family had actually been receiving money from BSM, not merely "accruing" it. This filing, again, quoted defendant Ruskusky's assurances to the court that Meier was not violating the injunction, a claim that the court did not accept.

¶ 30                                III. Meier Declares Bankruptcy

¶ 31    Just over two weeks after the jury verdict against him, on March 20, 2014, Meier filed for bankruptcy. In connection with Meier's bankruptcy petition, an examiner investigated Meier's assets. According to Shrock, the investigation "revealed [that] Meier violated the May 18, 2010 injunction barring any further 'profit sharing' to himself or his family."

¶ 32    In July 2014, the bankruptcy court lifted the automatic stay to allow Shrock to pursue his judgment against Meier for breach of fiduciary of duty and violating the injunction. Once the bankruptcy stay was lifted, the circuit court entered judgment against Meier on the jury's verdict for $11,164,500. According to Shrock, the bankruptcy court later determined that that debt was non-dischargeable, because Meier was guilty of fraud and breach of fiduciary duty.

¶ 33                    A. Shrock's July 14, 2014, Filing in Bankruptcy Court

¶ 34    On July 14, 2014, after defendant Ungaretti filed a claim in Meier's bankruptcy action, Shrock filed an objection, asking the court to disallow that claim for several reasons. Two of those reasons were:

> "12. In fact, *Ungaretti is liable to Shrock for concocting Meier's 'merger' and 'dissolution' strategies solely to divest Schrock, against his will, of his membership interest in the company*. Granewich v. Harding, 985 P.2d 788,796 (Or. 1999) (Lawyers are not immune from liability when they act with a 'controlling shareholder[ ]' of a

6

'closely held corporation' who breaches his fiduciary duty by trying to 'squeeze out' a minority shareholder.).

*\*\**

14. Finally, *Ungaretti's claim should be disallowed because of its misconduct in defending Meier*. Shrock still has pending motions against Ungaretti for failing to produce critical discovery documents and *conspiring with Meier to evade the injunction barring Meier from paying himself and [his wife and stepson] profit sharing*." (Emphases added.)

¶ 35    B. BSM's Putative Complaint Against Meier in Bankruptcy Court

¶ 36    On October 31, 2014, BSM filed a putative complaint against Meier. Much of that complaint's allegations duplicated what Shrock alleged in the complaint at issue in our case. He alleged that, in 2010, BSM borrowed $788,000 and then days later loaned Meier over $788,000 so he could buy a house. And before filing for bankruptcy, Meier made numerous financial transfers from BSM to himself, his wife, and his son in violation of the circuit court's 2010 injunction forbidding such transfers.

¶ 37    C. November 7, 2014: Meier Answers BSM's Complaint

¶ 38    On November 7, 2014, Meier filed his answer to BSM's putative complaint. In his answer, Meier *admitted* to precisely the same financial transfers of which Shrock had been accusing him for years, to the tune of over $16.3 million.

¶ 39    IV. November 18, 2016: Shrock Files This Lawsuit

¶ 40    Just over two years later, on November 18, 2016, Shrock and BSM filed the lawsuit before this court against Ungaretti, Nixon Peabody, and attorneys Ruskusky and Miller.

¶ 41 Shrock ultimately filed a second amended complaint, the operative pleading in this case. Ungaretti moved to dismiss, among other reasons, on the basis that plaintiffs' claims were time-barred under the two-year statute of limitations applicable to claims against attorneys for conduct arising out of their provision of professional services. See 735 ILCS 5/13-214.3(b) (West 2016).

¶ 42 The circuit court agreed with defendants on this point (among others) and dismissed the complaint with prejudice as time-barred. The court reasoned that, based on Meier's response to BSM's putative complaint in Meier's bankruptcy proceeding, Shrock "had actual knowledge of [Meier's] violations of the injunction" no later than November 7, 2014, more than two years before the original complaint was filed. This appeal followed.

¶ 43                                    ANALYSIS

¶ 44 We may affirm the dismissal of a complaint on any basis supported by the record, regardless of whether it was the basis for the trial court's dismissal. *Tzakis v. Berger Excavating Contractors, Inc.*, 2019 IL App (1st) 170859, ¶ 51. Because we agree with the trial court's dismissal on limitations grounds, we confine our analysis to that issue.

¶ 45 Section 13-214.3(b) of the Code of Civil Procedure provides:

"An action for damages based on tort, contract, or otherwise (i) against an attorney *arising out of an act or omission in the performance of professional services* *** must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." (Emphasis added.) 735 ILCS 5/13-214.3(b) (West 2016).

¶ 46 At the outset, Shrock sees opportunity in the italicized phrase, "arising out of an act or omission in the performance of professional services." Shrock argues that " 'arising out of'

requires the act or omission that caused injury be one the professional 'might reasonably be expected to perform' in fulfilling duties." Applying that rule to this case, Shrock concludes:

> "Here, Ungaretti's acts or omissions included falsely representing to the court and Plaintiffs that Meier was not violating the injunction or Operating Agreement. But these are not 'professional services' that Ungaretti was 'reasonably expected to perform' in 'fulfilling their duties'—they are [tortious], especially when Ungaretti was a fiduciary to Plaintiffs."

¶ 47     One immediate problem with this argument: Shrock pleaded claims against Ruskusky and Miller for legal malpractice as well as fraud, and both sets of claims incorporated by reference the same set of common allegations. That is to say, as Shrock sees things, the same allegations that give rise to a claim for legal malpractice against Ruskusky and Miller also support a claim for fraud. Shrock does not explain how a plaintiff can plead a claim, label it "legal malpractice," and then claim that the statute of limitations governing legal malpractice claims does *not* govern the timeliness of that claim. Of course it does.

¶ 48     In any event, our supreme court held only five years ago that section 13-214.3 covers all manner of claims that arise from an attorney's provision of professional services, not just legal malpractice claims between a client and lawyer. See *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 23. Indeed, based on *Riseborough*, we applied section 13-214.3(b) to an action much like the one before us, brought by a plaintiff against a law firm and one of its lawyers for aiding and abetting in a client's breach of fiduciary duty to the plaintiff. See *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶ 12. Section 13-214.3 governs this lawsuit, whether the allegations are styled as malpractice or fraud or conspiracy.

¶ 49    By its plain terms, section 13-214.3(b) incorporates the "discovery rule." *Id.* ¶ 13. That is, commencement of the statute of limitations is delayed " 'until the plaintiff knew or reasonably should have known of the injury and that it may have been wrongfully caused.' " *Id.* (quoting *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 672 (1997)). The critical inquiry when applying the discovery rule is whether and when the plaintiff develops "a reasonable belief that the injury was caused by wrongful conduct, thereby creating an obligation to inquire further on that issue." *Dancor*, 288 Ill. App. 3d at 673.

¶ 50    And significantly, it does not matter whether the plaintiff knows or suspects who the wrongdoer actually is; "[k]nowledge that an injury has been wrongfully caused 'does not mean knowledge of a specific defendant's negligent conduct' " or even " 'knowledge of the existence of a cause of action.' " *Janousek*, 2015 IL App (1st) 142989, ¶ 13 (quoting *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004)). Instead, "[a] person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct had occurred." *Id.*

¶ 51    The complaint alleges that the court in the original 2009 Lawsuit entered an injunction prohibiting Meier from giving himself or his family any further "profit sharing" and limited Meier from paying himself and his family salaries in excess of certain specified amounts. The complaint alleges that Meier violated that injunction and that defendants, his lawyers, assisted him in this violation: First, they claimed Meier was only "accruing" these profits but not pocketing them. Later, they tried to persuade the court that these payments were things like "bonuses" or salary hikes.

¶ 52    So the question is at what point did plaintiffs have sufficient information to reasonably believe that they had suffered an injury and that it was wrongfully caused? If the answer is more than two years before the date they sued defendants—November 7, 2016—then their complaint is time-barred.

¶ 53    As we will discuss, we must employ a different analysis when answering this question as to plaintiff Shrock, compared to our analysis of when the company, plaintiff BSM, had sufficient knowledge. So we will address them separately, starting with Shrock.

¶ 54                                                I

¶ 55    From the information we described above, it is immediately clear that Shrock had sufficient information to bring this lawsuit more than two years before he filed this lawsuit. We have detailed above numerous filings in the 2009 Lawsuit as well as the bankruptcy action, all of which predated this lawsuit by more than two years, that demonstrate Shrock's knowledge that Meier had violated the injunction. And even though, as noted above, it is not necessary that Shrock know the specific identity of those involved in this allegedly wrongful conduct (see *id.*), in fact several of those filings specifically accused defendants, the attorneys for Meier, as participating in Meier's violation by claiming in court that Meier was not violating that injunction.

¶ 56    Though we will not rehash everything we have described above, we would summarize it as follows.

¶ 57    First, though we could start earlier in the chronology: Shrock's August 2013 filing in the 2009 Lawsuit against Meier. There, Shrock alleged that Meier was trying to avoid the injunction by reclassifying forbidden "profit sharing" as bonuses or loans, noting there that he had proven those claims to be false via W-2s and other financial information, including expert testimony.

¶ 58    That filing also noted that defendant Ruskusky initially backed up his client Meier's claim that he was not pocketing this money, only to reverse course after being presented with Shrock's evidence and then claiming that they were mere bonuses or the like, not "profit sharing." The filing also claimed that the trial court was incredulous at counsel's position. And Shrock sought, in that filing, a rule to show cause against defendant Ruskusky and asked the court to sanction defendants Ruskusky and Ungaretti.

¶ 59    In his March 12, 2014, filing just after obtaining his massive verdict against Meier, Shrock reiterated the same arguments and claims, including defendant Ruskusky's assertions that Meier was not violating the injunction.

¶ 60    Those two filings, alone, are enough to show that Shrock possessed sufficient information to claim that he had been injured by the wrongful violation of the 2010 injunction, to say nothing of the fact that Shrock seemed quite clear on the parties—including Meier's lawyers, defendants herein—whom he considered guilty of that alleged violation.

¶ 61    In Shrock's July 14, 2014, filing in the bankruptcy action to object to Ungaretti's claim against Meier for payment of legal fees, Shrock out-and-out accused defendant Ungaretti of "conspiring with Meier to evade the injunction barring Meier from paying himself and [his wife and stepson] profit sharing." He even cited a decision from the Oregon Supreme Court, which he described as holding that "[l]awyers are not immune from liability when they act with a 'controlling shareholder[ ]' of a 'closely held corporation' who breaches his fiduciary duty by trying to 'squeeze out' a minority shareholder." Shrock was all but describing the lawsuit he would later file in November 2016.

¶ 62    If that isn't enough, fourth and finally, as of November 7, 2014, there could be no doubt that Shrock knew that Meier had violated the injunction because Meier *admitted*, in his answer to

BSM's putative complaint in bankruptcy, to all of those financial transfers, post-injunction, about which Shrock had been repeatedly and emphatically complaining.

¶ 63    So the record shows that, at least as early as August 2013, Shrock had ample information to suggest that Meier was wrongfully violating the injunction; that by July 14, 2014, Shrock had sufficient knowledge to file a pleading in federal bankruptcy court claiming that Ungaretti actively participated in and assisted Meier in violating the injunction; and that by November 7, 2014, Shrock had literal confirmation, straight from Meier himself, that Meier had engaged in the financial maneuvers that supposedly violated the injunction.

¶ 64    Even if we gave Shrock the most generous interpretation possible of this evidence, we agree with the trial court that Shrock had sufficient information, at least by November 7, 2014, if not over a year or two sooner, that he had been injured and that the injury was wrongfully caused. As his lawsuit was not filed until November 18, 2016, his complaint is barred by the statute of limitations.

¶ 65    Shrock argues that we should not judicially notice these filings in the underlying action or in the bankruptcy action. He claims that we may judicially notice that a document in another action was filed, but we can't take judicial notice of the *substance* of those claims. See, *e.g.*, *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 125 (judicial notice of fact that expert was deposed in other case was proper, but judicial notice of *substance* of expert's deposition testimony from another case inappropriate, as it "was not undisputed"); *People v. Shamhart*, 2016 IL App (5th) 130589, ¶ 39 (court may judicially notice that document was filed in other case, but factual allegations made therein not proper subject for judicial notice given that contents were disputed).

¶ 66 We fully agree that it would be improper to judicially notice the allegations in a pleading filed in another lawsuit and take those allegations to be *established facts* in this case. But we aren't doing that. We are talking here about information in Shrock's possession that would have given him a basis to know or reasonably know of his injury and that it was wrongfully caused. See *Janousek*, 2015 IL App (1st) 142989, ¶ 12; *Dancor*, 288 Ill. App. 3d at 672.

¶ 67 Take, for example, Shrock's objection to Ungaretti's claim in the bankruptcy proceeding filed on July 14, 2014, in which Shrock alleged that Ungaretti engaged in "misconduct in defending Meier" and "conspire[ed] with Meier to evade the [May 2010] injunction." We are merely judicially noticing that Shrock made those allegations, something we unquestionably may do. And from that, we are simply pointing out that, if Shrock had sufficient information to make those allegations in good faith in a federal bankruptcy filing as of July 2014, he certainly could have raised those same allegations at that time in a complaint against defendants.

¶ 68 Shrock repeatedly filed documents—motions, objections—claiming that he had proof that Meier had violated the injunction and pointing the finger squarely at defendants here, Meier's lawyers, as accomplices in Meier's wrongful conduct. Whether the substance of his claims were true is not the issue. The point is that he admitted that he possessed sufficient information to make those claims. Unless every one of those documents was entirely fictitious, in bad faith and in blatant violation of Illinois Supreme Court Rule 137 (eff. July 1, 2013) or similar federal rules governing good-faith pleadings—and Shrock has not disavowed any of those pleadings; he just says we can't consider them—those documents conclusively establish that Shrock had more than enough information to bring this action, more than two years before he filed this action on November 18, 2016.

¶ 69    For these reasons, we agree with the trial court that Shrock's claims are barred by the statute of limitations.

¶ 70                                        II

¶ 71    That leaves the timeliness of this complaint insofar as the other plaintiff, BSM, is concerned. BSM raises the same arguments above that Shrock did, and we reject those arguments for the same reasons we did as to Shrock.

¶ 72    But BSM adds another argument—that its statute of limitations was tolled under the "adverse domination" doctrine. The circuit court rejected that argument, and rightly so.

¶ 73    "Adverse domination" is an equitable doctrine that tolls the statute of limitations for claims by a corporation against its officers and directors during the time the corporation is controlled by those wrongdoing officers or directors. *Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 86 (1999). The doctrine "creates a rebuttable presumption" that the corporation does not "know" of the injury as long as it is controlled by the wrongdoing officers and directors. *Id.* at 90; see *Resolution Trust Corp. v. Chapman*, 895 F. Supp. 1072, 1077-78 (C.D. Ill. 1995) (" '[T]he doctrine of adverse domination presumes that while the wrongdoers possess knowledge of the claim, the potential corporate plaintiff *** does not have meaningful knowledge with the ability to act on that knowledge until the wrongdoing directors and officers no longer control it.' " (quoting *Resolution Trust Corp. v. Farmer*, 865 F. Supp. 1143, 1155 (E.D. Pa.1994))). In this regard, the doctrine is " 'simply a common sense application of the discovery rule to a corporate plaintiff.' " *Larney*, 308 Ill. App. 3d at 87 (quoting *Chapman*, 895 F. Supp. at 1078).

¶ 74    The rationale is simply that controlling managers or directors engaged in corporate wrongdoing can't be expected to sue themselves or tell others about their misconduct. *Id.* at 86; see also *Federal Deposit Insurance Corp. v. Greenwood*, 739 F. Supp. 450, 453 (C.D. Ill. 1989);

*Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) ("Because a plaintiff-corporation can learn that it has been injured only through the knowledge of its agents, if the agents' interests are adverse to the corporation, the agents' knowledge is not imputed to the corporation.").

¶ 75    And this doctrine applies not only to a corporation's lawsuit against his wrongdoing manager or director but also to a corporation's suit against any non-corporate actors who conspired with or aided the corporate wrongdoer. *Larney*, 308 Ill. App. 3d at 89-90 (doctrine tolled limitations period as to claims against "nonboard-member co-conspirator" as well as board-member defendants); *Independent Trust Corp.*, 665 F.3d at 936-37. The reasoning is the same: if a controlling board of directors or managers are unlikely to sue themselves, they are just as unlikely to sue the non-corporate actors who are helping them commit the wrongful conduct, as doing so would obviously shine a light on their own misconduct. *Larney*, 308 Ill. App. 3d at 89-90; *Independent Trust Corp.*, 665 F.3d at 936-37.

¶ 76    Here, then, BSM would point to the fact that Meier was the sole manager and overwhelming majority owner of BSM until Shrock purchased the company from Meier in 2015 in the bankruptcy proceeding. Until that time, so the argument goes, BSM's statute of limitations should be tolled, because just as Meier would never have permitted a lawsuit against himself or admitted to wrongdoing, likewise he never would have authorized a suit against his co-conspirator lawyers (defendants here), which would have exposed his own wrongdoing. Thus, says BSM, as the statute did not begin to run until 2015, when Meier sold his interest in BSM to Shrock, this lawsuit, filed in November 2016, was timely as to BSM's claims.

¶ 77    But as we noted above, the adverse-domination doctrine creates only a rebuttable presumption that the corporation lacks knowledge of its manager's wrongdoing. *Larney*, 308 Ill.

App. 3d at 90. That presumption "may be rebutted *** by evidence that someone other than the wrongdoing directors had knowledge of the cause of action and both the ability and the motivation to bring suit." *Id.*; *In re Emerald Casino, Inc.*, 867 F.3d 743, 760-61 (7th Cir. 2017) (quoting *Larney*, 308 Ill. App. 3d at 90); see also *Resolution Trust Corp. v. Smith*, 872 F. Supp. 805, 814 (D. Or. 1995); *Resolution Trust Corp. v. Grant*, 901 P.2d 807, 816 (Okla. 1995).

¶ 78    Here, that presumption has been rebutted. First, it cannot be seriously disputed that "someone other than the wrongdoing directors had knowledge of the cause of action." *Larney*, 308 Ill. App. 3d at 90. Shrock, as we have explained, had knowledge of BSM's potential claims in 2013 and throughout 2014, but certainly no later than November 7, 2014. Nor is there any doubt that Shrock had "the motivation to bring suit." *Id.* Shrock, in point of fact, has now filed two lawsuits (this one and the 2009 Lawsuit against Meier) seeking to recoup damages for harm that Meier, BSM's manager, caused BSM to suffer. And he filed multiple motions alleging violations of the 2010 injunction. Nobody could question Shrock's motivation.

¶ 79    That leaves to be determined whether Shrock had "the ability" to bring suit on behalf of BSM on November 7, 2014. He did. At all relevant times (and currently), section 40-1 of the Limited Liability Company Act, which governs manager-managed limited liability companies like BSM (see 805 ILCS 180/15-1 (West 2014)), provided in pertinent part:

>   "Right of action. No action shall be brought by a member *** in the right of a limited liability company to recover a judgment in its favor unless members or managers with authority to do so have refused to bring the action or unless an effort to cause those members or managers to bring the action is not likely to succeed." *Id.* § 40-1.

¶ 80    Thus, to determine whether Shrock could have brought a derivative suit against Ungaretti and its lawyers on behalf of BSM, we must determine whether (1) the BSM manager "with

authority" to initiate a suit against Ungaretti on BSM's behalf refused to do so or (2) "an effort to cause" the BSM manager with authority to authorize such litigation would have been unlikely to succeed. See *id.*

¶ 81    Here, Meier was the manager with authority to authorize BSM to initiate litigation. Indeed, under section 6.1.2 of the operating agreement, Meier, as BSM's sole manager, had the "full, exclusive, and complete discretion, power, and authority" to "manage, control, administer, and operate" BSM and "make all decisions affecting such business and affairs." Without a doubt, a limited liability company's decision to initiate litigation squarely relates to the company's "business" or "affairs." And pursuant to the agreement, when it came to BSM's "business and affairs," Meier's word was law: He had "full, exclusive, and complete discretion, power, and authority" to "make all decisions affecting [BSM's] business and affairs."

¶ 82    The crux of Shrock's dispute with Meier was that Meier diluted BSM's financial assets for his own gain, to the detriment of Shrock and BSM. His beef with Ungaretti and its lawyers was born of the same dispute: They helped Meier in a fraudulent scheme to circumvent the 2010 injunction and continue depleting BSM's assets.

¶ 83    Given the nature of Shrock's allegations in this case, there is simply no possibility that Meier, had he been asked by Shrock, would have authorized this lawsuit. Meier repeatedly denied violating the injunction via his attorneys in the 2009 Lawsuit. He never would have authorized a lawsuit against himself raising those same allegations. Indeed, *Larney* itself recognizes the inherent futility in asking a corporate director to initiate litigation targeted at that person's own wrongdoing. See *Larney*, 308 Ill. App. 3d at 86; see also *Caparos v. Morton*, 364 Ill. App. 3d 159, 170 (2006) ("It would have been futile for plaintiffs to have requested that Morton or DeGraff sue themselves and the corporate general partner ***."); *Brown v. Tenney*,

155 Ill. App. 3d 605, 610 (1987) ("[G]enerally in a case such as that before us, where the majority of directors are themselves involved in the matters complained of, it is evident that a demand would be unavailing and therefore can be excused."); *Valiquet v. First Federal Savings & Loan Ass'n of Chicago*, 87 Ill. App. 3d 195, 200 (1979) (finding that demand requirement for shareholder derivative lawsuits brought under Illinois law was excused, as such request would have been futile in light of plaintiff's allegations that defendant's directors faced joint and several liability for participating in fraudulent scheme to usurp corporate opportunities).

¶ 84     Because a request to authorize this litigation would have been hopelessly futile, Shrock was entitled, under section 40-1, to file a lawsuit on BSM's behalf against Ungaretti, its successor Nixon Peabody, and the two individual attorneys. And, as we have explained, Shrock knew by no later than November 7, 2014, and in our opinion well before that, that Meier was violating the injunction. Thus, at that point in time, Shrock could have initiated a derivative action on behalf of BSM against defendants here, Meier's lawyers.

¶ 85     Because Shrock had the motivation, ability, and requisite knowledge to bring a cause of action against Ungaretti long before the two-year window, the adverse-domination presumption in this case was rebutted. As a result, that doctrine cannot be applied to toll the running of BSM's statute of limitations. BSM's claims are likewise time-barred.

¶ 86     We thus affirm the trial court's dismissal of the complaint on limitations grounds as to each plaintiff. If the allegations in the complaint are true, which we assume at this pleading stage, we are sympathetic to Shrock, but we cannot ignore the relevant statute of limitations.

¶ 87                                     CONCLUSION

¶ 88     The judgment of the circuit court is affirmed.

¶ 89     Affirmed.

**No. 1-18-1698**

| | |
|---|---|
| **Cite as:** | *Shrock v. Ungaretti & Harris Ltd.*,<br>2019 IL App (1st) 181698 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-11404; the Hon. Patricia O. Sheahan, Judge, presiding. |
| **Attorneys for Appellant:** | John Xydakis, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Michael T. Trucco and Brian E. Martin, of Stamos & Trucco LLP, of Chicago, for appellees. |