2024 IL App (1st) 211098

Nos. 1-21-1098, 1-22-0872, and 1-22-1473 (cons.)

Order filed February 13, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| BONNIE GIRSCH, as Special Representative of the Estate of John F. Girsch, Deceased, EDWARD ZIFKIN, MARK MUNARETTO, and MARK WHEELES, Individually and derivatively on behalf of TB LIMITED PARTNERSHIP; and MARK MUNARETTO and WILLIAM SKRZELOWSKI, Individually and derivatively on behalf of I.B.P. LIMITED PARTNERSHIP, | Appeal from the Circuit Court of Cook County. |
| Intervening-plaintiffs-appellees and Cross-Appellants, | No. 01 CH 21984 |
| and | The Honorable Neil H. Cohen and John J. Curry, Jr., Judges Presiding. |
| THE LAW OFFICES OF EDWARD T. JOYCE & ASSOCIATES, P.C., | |
| Appellee and Cross-Appellant, | |
| v. | |
| DENNIS J. HIFFMAN; E. THOMAS COLLINS; and RICHARD E. HULINA, | |
| Defendants-appellants and Cross-appellees. | |

_____

| | |
|---|---|
| JOHN F. GIRSCH, *et al.*, | |
| Plaintiffs-appellants, | |

Nos. 1-21-1098, 1-22-0872, and 1-22-1473 (cons.)

|  | ) |
| v. | ) |
|  | ) |
| THOMPSON COBURN LLP; ICE MILLER LLP; LOCKE LORD | ) |
| LLP; TABET DIVITO & ROTHSTEIN LLC; I.B.P. LIMITED | ) |
| PARTNERSHIP; and TB LIMITED PARTNERSHIP, | ) |
|  | ) |
| Respondents-Appellees. | ) |

_____

        JUSTICE LAVIN delivered the judgment of the court.
        Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

## ORDER

¶ 1    *Held*: The circuit court's final judgment and award of attorney fees is affirmed where intervening plaintiffs' claims were timely based on the discovery rule, tax gross-up damages were appropriate under the circumstances of this case, and defendants did not show that application of the common fund doctrine amounted to an abuse of discretion. Additionally, the court did not err in finding that defendants, as general partners of the Limited Partnerships, were entitled to share in the derivative judgment awards. Finally, we reverse the court's dismissal of intervening plaintiffs' citations to discover assets as the citations were properly issued in the parties' post-judgment collection proceedings, and we remand with instructions for the court to grant the citations.

¶ 2    This consolidated appeal stems from underlying litigation involving a derivative shareholder action brought more than twenty years ago by the limited partners of I.B.P. Limited Partnership (I.B.P.) and TB Limited Partnership (TB) against the general partners of those Limited Partnerships for breach of their fiduciary duties. More specifically, Marc Munaretto and William Skrzelowski brought the suit at issue here on behalf of I.B.P., while Munaretto, Edward Zifkin, Mark Wheeles, and John Girsch, who died during the pendency of this litigation and is now represented by his estate, brought the suit on behalf of TB (collectively referred to as intervening plaintiffs).[1] Additionally, Munaretto, Wheeles, Zifkin, and Girsch, individually, brought suit against the general partners of those Limited Partnerships, namely, E. Thomas

_____

       [1]The action was first initiated by Melissa S. Pielet, individually and derivatively on behalf of the Limited Partnerships, as will be discussed in more detail below.

Collins, Jr., Richard E. Hulina, and Dennis J. Hiffman (collectively, defendants), as well as former defendant John E. Shaffer, who was later dismissed as a party to the litigation pursuant to a settlement agreement between the parties.

¶ 3      In the midst of the ongoing, decades-long litigation, intervening plaintiffs entered into a settlement agreement with Shaffer, ultimately resulting in $2.4 million being distributed to intervening plaintiffs and $1.6 million being distributed to their counsel, the Law Offices of Edward T. Joyce & Associates, P.C. (hereafter, derivative counsel). The circuit court later ruled that the proceeds from the Shaffer settlement belonged to the Limited Partnerships, not to the individual, intervening plaintiffs, and therefore, the court set off the $2.4 million from the amounts allocated to intervening plaintiffs in the resulting final judgment order. Meanwhile, defendants, as majority interest holders, agreed to not enforce "any rights to collect any amounts due to the Limited Partnerships" from the ultimate derivative awards in this case.

¶ 4      As will be discussed in more detail below, the circuit court issued a final judgment finding that defendants breached their fiduciary duties to the Limited Partnerships and the limited partners, and that the Limited Partnerships suffered compensatory damages totaling $87,325,788.[2] The court thus entered judgment in favor of the Limited Partnerships for that sum. Due to the setoff from the Shaffer settlement, however, the court found that Girsch's estate, Zifkin, Munaretto, Wheeles, and Skrzelowski, were not entitled to any distribution of the derivative award. In addition, the court found that Collins and Hulina breached their fiduciary duties to Girsch's estate, Zifkin, Munaretto, and Wheeles, and as result, awarded them individual compensatory damages in various amounts that will be discussed below.

_____

[2]By this time, Girsch had passed away and the circuit court identified the Estate of John Girsch as a plaintiff in the action.

¶ 5 Finally, the court awarded derivative counsel a total of $15,902,100.91, a fee equal to twenty percent (20%) of the total $87,325,788, common fund less the $1.6 million that derivative counsel received as a result of the Shaffer settlement, plus litigation expenses. That award was to be "paid out of the common funds," since derivative counsel obtained the judgment on behalf of the Limited Partnerships and defendants were entitled to share in that recovery, an issue that will be discussed at length below.

¶ 6 Defendants subsequently failed to post an appropriate appeal bond, leading intervening plaintiffs and derivative counsel to issue citations to discover assets in the name of the Limited Partnerships. The citations were issued to, among others, defendants' attorneys and third parties, Thompson Coburn, LLP, Ice Miller, LLP, Locke Lord, LLP, and Tabet DiVito & Rothstein, LLC. Those third parties, along with the Limited Partnerships, then moved, successfully, to quash the citations to discover assets. Specifically, the circuit court dismissed the citations with prejudice and barred intervening plaintiffs and their counsel "from undertaking collection proceedings to collect the judgment on behalf of" the Limited Partnerships, finding that intervening plaintiffs and derivative counsel lacking individual standing to pursue the citations to discover assets based on their receipts of the individual judgment awards and the fact that defendants, as the general partners of the Limited Partnerships acting on behalf of those partnerships, agreed to forego collection of the derivative awards entered against them. Last, the court agreed with defendants that they could decide, amongst themselves, and on behalf of the Limited Partnerships, to not fund the common fund from which derivative counsel's fee award was to be paid.

¶ 7 On appeal, defendants do not challenge the circuit court's finding that they breached their fiduciary duties to the Limited Partnerships, as well as to Girsch's estate, Zifkin, Munaretto, and

Wheeles. Rather, defendants set forth a number of arguments contending that intervening plaintiffs' derivative claims were barred by the applicable statute of limitations period, or alternatively, the applicable statute of repose, because the claims were filed more than five years after the transactions at issue occurred. Defendants further argue that the discovery rule, which delays commencement of the applicable limitations period, did not apply to those derivative claims because some of the limited partners, who are not parties to this litigation, had contemporaneous knowledge of the wrongful transactions and the ability to sue, thereby precluding application of the discovery rule. Last, defendants contend that the lower court erroneously added approximately $18 million in tax gross-up amounts to the derivative awards and improperly applied the common fund doctrine when the court awarded derivative counsel roughly $15.8 million in attorney fees since that award benefits no party, only the Limited Partnerships.

¶ 8     On cross-appeal, intervening plaintiffs first contend that the lower court erred in finding that defendants, as general partners of the Limited Partnerships, were entitled to share in the compensatory damages award because defendants should not benefit from their own wrongdoing. Intervening plaintiffs also set forth a number of arguments that the court erroneously awarded defendants a setoff relating to the purchase of the Developer Bonds in this case.[3] Finally, intervening plaintiffs contend that the court erred in both dismissing their citations to discover assets and in barring them from undertaking post-judgment collection proceedings to collect the derivative judgments on behalf of the Limited Partnerships because those rulings "effectively voided" the judgments and award of attorney fees to derivative counsel.

---

[3]These arguments were later withdrawn in intervening plaintiffs' cross-reply brief, which we note below.

¶ 9       In response, third party respondents I.B.P., TB, Thompson Coburn, LLP, Ice Miller LLP, Locke Lord LLP, and Tabet DiVito & Rothstein LLC, assert that the citations to discover assets were properly dismissed because intervening plaintiffs lacked standing to pursue the citations because intervening plaintiffs were not entitled to any distributions from the derivative awards since their individual awards had already been satisfied in full.

¶ 10      For the following reasons, we affirm in part and reverse in part the lower court's judgment and remand for further proceedings consistent with this decision.

¶ 11                              I. BACKGROUND

¶ 12      As this is the second time this litigation is before us (see related case, *Pielet v. Hiffman*, 407 Ill. App. 3d 788 (2011)), and given the extensive appellate record consisting of over 100 thousand pages, we will address only those facts necessary for the resolution of this consolidated appeal and cross-appeal.

¶ 13      In the early 1990s, HSA Commercial Real Estate, Inc. ("HSA"), a real estate development, leasing, brokerage and management firm, began developing two shopping centers in west suburban Chicago: the Bedford Park Development and the Broadview Development. These projects involved substantial real estate development. Intervening plaintiffs' derivative claims challenge three transactions pertaining to the developments – the first in 1992, the second in 1994, and the third in 2001 – and involve three sets of municipal bonds that were issued to HSA's principals to help fund those development projects.

¶ 14      Defendants and general partners Hiffman, E. Thomas Collins, Jr., and Hulina, were principals in the HSA, along with former defendant John Shaffer, who ultimately settled the claims against him prior to trial, and former defendant Daniel G. Anderson, who died while this case was pending. Shaffer and Hiffman founded HSA's predecessor in the 1970s, while Shaffer

also served as HSA's chairman and Chief Executive Officer (CEO). The original derivative plaintiff in this litigation, Melissa Pielet, as well as intervening plaintiffs Munaretto, Skrzelowski, Girsch (now deceased), Zifkin, and Wheeles, were HSA employees in the 1990s.

¶ 15    In January 1992, the HSA principals formed an Illinois limited partnership, known as I.B.P. Limited Partnership ("I.B.P."), to develop a shopping center in Bedford Park, Illinois. In May 1993, the HSA principals formed another Illinois limited partnership, known as TB Limited Partnership ("TB"), to develop a shopping center in Broadview, Illinois. The HSA principals became general partners of both Limited Partnerships, and they collectively owned the majority of the limited partnership interests in each company. The HSA principals personally guaranteed constructions loans of roughly $14 million and $34 million for the Bedford Park and Broadview developments, respectively.

¶ 16    Minority interests in I.B.P. were initially split among certain HSA employees, including Munaretto and Skrzelowski (the "I.B.P. Intervenors" below), and Pielet. Likewise, minority interests in TB were split among certain HSA employees, including Munaretto, Girsch, Wheeles, and Zifkin (the "TB Intervenors" below), and Pielet. The HSA principals awarded these minority interests to the employees of the partnerships as a "little additional perk" or "gift" to "help incentivize them and keep them loyal and bring projects to the company." The HSA employees paid little or nothing for their interests in I.B.P. and TB. The HSA employees ultimately each received distributions totaling between $68,500 and $235,599, from their limited partnership interests in I.B.P. and/or TB.

¶ 17    The general partners used Tax Increment Financing ("TIF") bonds, which are financial instruments issued by municipalities to assist in the funding of redevelopment projects in designated areas (see 65 ILCS 5/11–74.4 *et seq*. (West 2008)), to help fund the development

projects in this case. "The principal and interest on TIF bonds are paid from the increase in real estate taxes, and sales taxes in certain cases, that is anticipated to occur from a successful redevelopment project." *Pielet*, 407 Ill. App. 3d at 790. The villages of Bedford Park and Broadview, respectively, issued senior lien TIF bonds ("Senior Bonds") to the Limited Partnerships. Specifically, Bedford Park issued $10.5 million in Senior Bonds, while Broadview issued $23 million in Senior Bonds. Additionally, the villages agreed to issue TIF bonds that were subordinate to the Senior Bonds. Bedford Park issued "Developer Bonds" worth $7 million, and Broadview issued "Junior Bonds" in the amount of $8 million.

¶ 18     After the bonds were issued, the redevelopment projects became successful, generating tax revenues in excess of the projects' projections. Consequently, the Senior Bonds' obligations were fulfilled with cash distributions being made to all partners, and the Developer and Junior Bonds also increased in value. The transactions concerning the Developer and Junior Bonds served as the basis for intervening plaintiffs' breach of fiduciary duty lawsuit against defendants.

¶ 19     We note that Sunshine Bond Limited Partnership (Sunshine Bond) was formed for the purpose of purchasing the Developer Bonds from I.B.P. Sunshine Bond's general partner, Sunshine Bond, Inc., was controlled by defendants and Shaffer. Furthermore, Sunshine Bond's limited partners were I.B.P.'s general partners and/or family trusts that were created by I.B.P.'s general partners for the purpose of acquiring the Developer Bonds from I.B.P., which defendants ultimately did for $550,000.

¶ 20     In any event, in 1999, Broadview refinanced the Senior and Junior Bonds, obtaining new bonds with lower interest rates. Defendants, as general partners of TB, were subsequently paid $9 million in order for Broadview to redeem the bonds, in addition to roughly $4.35 million in interest payments, for a total amount of more than $13 million. A few years later, Pielet filed suit

against defendants on behalf of herself and the Limited Partnerships, alleging, among other things, that defendants breached their fiduciary duties to the partnerships by transferring the subordinate bonds to themselves for their own benefit.[4] Meanwhile, the Broadview Village Center lost two large tenants, resulting in TB falling short of its financial obligations and the initiation of foreclosure proceedings against TB's mortgage.

¶ 21    To avoid foreclosure, TB developed a plan to recapitalize and restructure its debt that required $5.5 million in cash. This triggered a "capital call" that called for all partners to contribute funds in proportionate shares to meet the financial needs of the partnership. While the limited partners were not required to contribute funds, any partner who declined to contribute would forfeit his or her partnership interest. The capital call was set to occur in September 2003. Shortly thereafter, the general partners offered to settle Pielet's action by making a $5.5 million loan to TB in lieu of the capital call, leading Pielet to withdraw from the action she initiated.[5] Another limited partner was subsequently granted leave to intervene as a party plaintiff, but after he failed to adequately represent the partnerships, intervening plaintiffs obtained leave to intervene in the matter.

¶ 22    Intervening plaintiffs' complaint alleged that defendants breached their fiduciary duties to the partnerships because they misappropriated the Junior Bonds and issued a capital call that was only necessitated by their alleged misappropriation. Specifically, the complaint alleged, among other things, that intervening plaintiffs were unaware of the events surrounding the Junior Bonds transaction and that the limited partners did not receive any cash distributions from the Junior Bonds, while defendants ultimately received over $13 million from owning the Junior Bonds.

---

[4]In addition to defendants, Pielet also sued Daniel G. Anderson (deceased former general partner of I.B.P., see *supra* ¶ 14) and Mary Riordan, an Illinois attorney who represented the Limited Partnerships, as well as the general and limited partners of those partnerships, including Pielet.

[5]Pielet withdrew from the action in December 2003.

¶ 23    Before the capital call, intervening plaintiffs sought, unsuccessfully, to prevent

defendants from foreclosing intervening plaintiffs' partnership interests if they chose not to

contribute to the capital call. Intervening plaintiffs subsequently declined to contribute to the

capital call. Defendants then moved, successfully, to dismiss the claims relating to TB on the

basis that intervening plaintiffs lacked standing to pursue those claims since they had forfeited

their partnership interests.

¶ 24    Meanwhile, pursuant to I.B.P.'s partnership agreement, I.B.P. repurchased Munaretto and

Skrzelowski's interests after those individuals left HSA. Defendants then moved to dismiss

Munaretto and Skrzelowski's claims for lack of standing. The circuit court granted the motion,

and intervening plaintiffs appealed. See *id*., 407 Ill. App. 3d at 788.[6]

¶ 25                                    A. *Pielet v. Hiffman* (2011)

¶ 26    In *Pielet v. Hiffman*, this court ultimately held that intervening plaintiffs had standing to

pursue their claims based on principles of equity and reversed the lower court's orders

dismissing intervening plaintiffs' claims for lack of standing. In reaching that decision, we found

that regardless of the language in the TB partnership agreement, each partner still had to uphold

his or her fiduciary duty to the partnership and had to exercise the utmost good faith and honestly

in all matters relating to the partnership business. Specifically, we noted that "Illinois has held

that this fiduciary duty prohibits all forms of secret dealings and self-preference in any

[partnership] matter" and "requires each partner to fully disclose partnership business to other

partners." (Internal quotation marks omitted.) *Id*. at 795. Based on those legal principles, we

concluded that:

---

[6]We note that the first decision by this court named "Pielet" in the caption, even though she had already withdrawn from the case.

"[W]hen we take intervenors' well-plead facts as true and draw the reasonable inferences therefrom, the allegation remains that the general partners, through their management discretion and authority, obfuscated the personal taking of the Junior Bonds originally designated as partnership assets, which resulted in a financial windfall to them of over $13 million. The partnership then experienced a shortage of funds and the general partners imposed a financial obligation upon the intervenors, resulting in their loss of interests in TB. Permitting intervenors' cause of action to be dismissed, and essentially validating their loss of interest, by pointing to management discretion and authority without consideration of the overarching principles of partnership fiduciary duties here would miss the forest for the trees." *Id*. at 797.

¶ 27    We rejected defendants' arguments that intervening plaintiffs lacked standing to bring the derivative claims since defendants did not act in good faith in repurchasing the partnership interests and then raising their standing defense, for the first time, more than eight years after the litigation had begun:

"The motivation behind the exercise of that right was not to buy back interests of limited partners no longer associated with HSA, but primarily to simply remove intervenors' standing. Doing so is an exercise of discretion that was utilized in a manner inconsistent with the parties' reasonable expectations. While we acknowledge that repurchase options may legitimately serve a variety of purposes, they cannot operate to remove a party's standing under circumstances like those in the case *sub judice*." *Id*. at 799.

Accordingly, we reversed and remanded for further proceedings consistent with our decision.

¶ 28                              B. Remand and Shaffer settlement

¶ 29    Following remand, intervening plaintiffs filed, as relevant here, a two-count third amended complaint seeking the imposition of a constructive trust, an injunction, an order of disgorgement, restoration of the partnership interests of certain TB limited partners, compensatory and punitive damages, prejudgment interest, attorney fees and other relief. The complaint alleged, in the main, that defendants acted unlawfully because they (1) breached their fiduciary duties to intervening plaintiffs and the Limited Partnerships by misappropriating assets and opportunities of the Limited Partnerships to their own personal benefit, and (2) breached the agreements of the Limited Partnerships by taking unauthorized fees and compensation. Count I set forth intervening plaintiffs' breach of fiduciary allegations against defendants with respect to I.B.P., while count II set forth their breach of fiduciary allegations against defendants relating to TB.

¶ 30    More specifically, intervening plaintiffs alleged that defendants, as general partners of the Limited Partnerships, spent $15 million in borrowed cash to pay for certain TIF-qualified improvements in the villages of Broadview and Bedford Park. As a result of that spending, the Limited Partnerships received TIF bonds with a total face value of $15 million. Rather than allowing the Limited Partnerships to retain those TIF bonds and the resulting benefits, defendants transferred the bonds to themselves and/or their family trusts or other entities they controlled for "virtually no consideration." As a result of their self-dealing, defendants received "more than $24 million (possibly as high as $50 million)" in principal and tax-free interest payments from the villages, while the partnerships received "no meaningful benefit from [d]efendants' self-dealing."

¶ 31    Meanwhile, in May 2017, the circuit court preliminarily approved a proposed settlement between intervening plaintiffs and Shaffer under which $2.4 million would be distributed to

intervening plaintiffs in settlement of their claims against Shaffer, $1.6 million would be distributed to derivative counsel for attorney fees and litigation expenses, $560,000 would be distributed to Pielet's counsel for attorney fees and litigation expenses, and $940,000 would be distributed to Shaffer based on his individual *pro rata* ownership in the Bedford Park Developer Bonds and the Broadview Junior Bonds. Defendants, however, objected to the proposed settlement, asserting that Illinois law "requires *any* funds that result from derivative claims to first be paid to the entities, then distributed to all partners *pro rata*."

¶ 32     Shaffer subsequently assigned all his interests in the Limited Partnerships to Hulina and Collins as part of a "settlement and mutual release" between Collins, Hulina and Hiffman on one hand, and Shaffer on the other hand. Consequently, Hulina and Collins withdrew their objections in exchange for the assignment of Shaffer's direct and indirect interests in I.B.P. and TB. The circuit court approved the Shaffer settlement on July 17, 2017.

¶ 33                                      C. Summary judgment rulings

¶ 34     On August 21, 2017, the circuit court entered an order, granting in part defendants' motion for partial summary judgment, which, once again challenged (unsuccessfully), among other things, intervening plaintiffs' standing to bring their claims. The court ruled that (1) any recovery on the derivative claims had to be paid to the Limited Partnerships, (2) those damages, if any, had to be distributed to every partner according to each partner's percentage of ownership interest in the Limited Partnerships, regardless of any partner's wrongdoing, (3) intervening plaintiffs were entitled to attorney fees under the "common fund doctrine" if they ultimately succeeded on their claims against defendants, and that (4) the recovery of attorney fees would not be limited by intervening plaintiffs' percentage of ownership interest.

¶ 35    Finally, the court denied defendants' motion for partial summary judgment as to the issues of intervening plaintiffs' entitlement to attorney fees, intervening plaintiffs' adequacy as representatives of the limited partners' interests, and Girsch's standing, which defendants challenged based on the fact that he had died, and TB had repurchased his shares in the partnership.

¶ 36                    D. 2017 Bench trial and first judgment ruling

¶ 37    The parties proceeded to a bench trial beginning on October 2, 2017.[7] Because defendants do not challenge on appeal the lower court's fiduciary findings following trial, we need not address the various, specific evidence that was adduced at that trial in support of those findings.

¶ 38    In December 2018, the circuit court announced that it would be entering judgment against the general partners on all of intervening plaintiffs' derivative claims regarding the 1992, 1994, and 2001 bond purchases, as well as TB Intervenors' direct claims regarding the capital call. The court noted that it would be adding damages awards for prejudgment interest and tax gross-ups on each of the three derivative awards. Notably, the court stated that it was "astounded by the amount of *** compensatory damages." While the court initially continued intervening plaintiffs' request for punitive damages to allow for additional discovery on the matter, it ultimately declined to award such damages. Additionally, the court stated that it would award derivative counsel attorney fees under the common fund doctrine. The court adopted the proposed findings of fact and conclusions of law filed by derivative counsel "as its own," and directed derivative counsel to prepare a judgment order consistent with those rulings.

---

[7]The bench trial proceeded before Judge Neil H. Cohen.

¶ 39 We note that this judgment was later vacated due to various mathematical errors in the court's damages calculations. The correct, final judgment will be addressed below.

¶ 40 Almost three years of posttrial proceedings followed during which the general partners identified a mathematical error in the court's imposition of tax gross-up damages, which inflated the judgment by approximately $27 million. The court subsequently corrected the mathematical error.

¶ 41 Also during posttrial proceedings, defendants argued, for the first time, that the damages awarded to I.B.P. had to be setoff by the $550,000, that Sunshine Bond paid to acquire the Developer Bonds from I.B.P. Specifically, defendants asserted that Sunshine Bond's payment of the $550,000, "including the impact of this amount upon prejudgment interest and tax gross up damages, must be factored by [the circuit court] when entering its final judgment." The court denied defendants' motion, but it granted defendants leave to supplement their motion to better explain the basis of it. The next year, defendants filed their supplemental motion regarding the proper application of amounts paid to I.B.P. for the Developer Bonds. Defendants asserted, for the first time, that they were entitled to a setoff totaling $1,489,067.30, to account for the $550,000, that Sunshine paid to I.B.P. to acquire the developer bonds ("which is 5.1% of the $10,775,089 principal claim of the Intervening Plaintiffs for the Developer Bonds, *i.e.* before prejudgment interest and 'tax gross up' is added").

¶ 42                              E. Setoffs and Shaffer settlement proceeds

¶ 43 In February 2021, the circuit court found that, even though defendants "did not make any argument in their post-trial findings of fact and conclusions of law regarding a setoff in connection with the 1992 transaction," intervening plaintiffs should not be awarded a double recovery simply because defendants failed to make that argument. The court thus held that "the

award to I.B.P. should be reduced by the $550,000 paid to I.B.P. to acquire the developer bonds" because "[n]ot accounting for the $550,000 paid to I.B.P. would result in a double recovery as to that amount."

¶ 44     Also in February 2021, the circuit court entered an order, finding that the Shaffer settlement proceeds belonged to the Limited Partnerships, not to the individual, intervening plaintiffs; thus, intervening plaintiffs had to remit that money to the Limited Partnerships. For practical reasons, however, the court ordered that the $2.4 million of settlement proceeds would be set off from the amounts allocated to intervening plaintiffs in the final judgment order. The next day, defendants, who were still general partners of the Limited Partnerships, agreed "not to enforce any rights to collect any amounts due to the Limited Partnerships" related to the damages sought in the derivative claims.

¶ 45                              F. Final judgment

¶ 46     The circuit court entered its final judgment in this matter on August 4, 2021.[8] As to count I, the court found that defendants breached their fiduciary duties to I.B.P. and its limited partners through defendants' purchase of the Bedford Park Developer Bonds. The court found that, as a result of those breaches, I.B.P. suffered compensatory damages totaling $28,647,399, and it entered judgment in favor of I.B.P. for that amount. As a result of the setoff from the Shaffer settlement, however, the court found that intervening plaintiffs were not entitled to any distribution of that derivative award.

---

[8]The circuit court initially entered its judgment order following trial, on December 21, 2018. The parties, however, subsequently agreed that the judgment amounts initially calculated by the court included mathematical errors relating to the court's damages calculations; thus, the court vacated its December 21, 2018, order and entered its final judgment order on August 4, 2021, which corrected those mathematical errors, among other things.

¶ 47    Additionally, as to the second part of count I, the court found that Collins and Hulina breached their fiduciary duties to I.B.P. and its limited partners "through their usurpation of the corporate opportunity to purchase the '2001 Sr. Bonds.' " The court found that, as a result of those breaches, I.B.P. suffered compensatory damages in the total amount of $17,607,626, and it entered judgment in favor of I.B.P. for that amount. Once again, the court found that, due to the setoff, intervening plaintiffs were not entitled to any distribution of that derivative award.

¶ 48    Next, as to count II, the court found that defendants breached their fiduciary duties to TB and its limited partners "through their purchase of the Broadview Junior Bonds." As a result of those breaches, the court found that TB suffered compensatory damages totaling $41,070,763, and it entered judgment in favor of TB for that amount. The court further found that, as a result of the Shaffer settlement setoff, intervening plaintiffs were not entitled to any distribution of that derivative award.

¶ 49    The court then found, as to the second part of count II, that Collins and Hulina breached their fiduciary duties to Munaretto, Wheeles, Zifkin and Girsch, "through their conduct in making the 2004 Capital Call." Due to those breaches, the court restored Munaretto's, Wheeles', Zifkin's and Girsch's limited partnership interests in TB as if they were never forfeited. The court further found that, as a result of the breaches, Munaretto suffered compensatory damages in the amount of $250,709, Wheeles suffered compensatory damages in the amount of $158,736, Zifkin suffered compensatory damages in the amount of $116,717, and Girsch suffered compensatory damages in the amount of $116,717. After applying setoffs from the Shaffer settlement (under which the nominal plaintiffs collectively received $2,341,910.40), the court found that Munaretto was entitled to $124,539.86, Wheeles was entitled to $79,078.01, Zifkin was entitled to $58,268, and Girsch was entitled to $58,268.

¶ 50    Finally, the court awarded derivative counsel "a fee equal to twenty percent (20%) of the total $87,325,788, common fund created through [his] efforts, less the $1.6 million that [he] received through the Shaffer settlement." Thus, the total fee award to derivative counsel was $15,865,157.60. The court also awarded derivative counsel reimbursement for litigation expenses in the amount of $36,442.31, and $501 for reimbursement of court filing fees. Those fees and expenses were to be paid "out of the total common funds."

¶ 51                              G. Circuit court's May 13, 2022, order

¶ 52    After the final judgment was entered in this case, defendants filed a post-judgment motion, arguing that the circuit court erroneously awarded derivative counsel $15,865,157.60, in attorney fees. Additionally, defendants filed "HCH's Amended Motion to Set An Appeal Bond or Alternative Security and For Extension of Time," arguing that they should be allowed to post an appeal bond "at a level sufficient to cover only the amount of the Nominal Plaintiffs' net compensatory damages," which was at most $320,153. Defendants further argued that they were not required to bond the attorney fees because "Nominal Plaintiffs are not judgment creditors as to such amounts" and appeal bonds only protect such creditors. The circuit court denied defendants' motion to set appeal bond, as did this court when defendants asked for the same relief here.

¶ 53    Meanwhile, intervening plaintiffs initiated post-judgment collection proceedings.[9] As part of those proceedings, intervening plaintiffs filed citations to discover assets in the name of the Limited Partnerships after defendants failed to post an appropriate appeal bond. The citations were issued to, among others, Collins Interests, Ltd., Hulina, LLC, Hulina Family, LLC, and Sunshine Bond. Additionally, the citations were issued to defendants' attorneys and third parties,

_____

[9]These proceedings were before a different circuit court judge (Judge John J. Curry, Jr.), than the judge who presided over the trial and entered the final judgment in this case (Judge Neil H. Cohen).

Thompson Coburn, LLP, Ice Miller, LLP, Locke Lord, LLP, and Tabet DiVito & Rothstein, LLC.

¶ 54    Those third parties, along with the Limited Partnerships, then moved, successfully, to quash the citations. Specifically, they asserted that all derivative claims had been fully satisfied because defendants, as the general partners and majority shareholders of the Limited Partnerships, had agreed on behalf of themselves and the Limited Partnerships that they would not collect the judgments entered in favor of the Limited Partnerships and against defendants. Additionally, they argued that intervening plaintiffs were not permitted to issue citations on behalf of the Limited Partnerships because defendants still controlled those partnerships and did not agree to issue the citations. They further argued that intervening plaintiffs had no interest in collecting the derivative judgment because their shares of that judgment, along with their individual judgments, had already been satisfied.

¶ 55    On May 13, 2022, the circuit court granted the motions to quash the citations, dismissed with prejudice all citations to discover assets, and barred intervening plaintiffs and derivative counsel from undertaking post-judgment collection proceedings to collect the derivative judgment on behalf of or in the name of the Limited Partnerships. The court subsequently denied intervening plaintiffs' motion to reconsider.

¶ 56    This appeal and cross-appeal followed.

¶ 57                                    II. ANALYSIS

¶ 58                                A. Defendants' direct appeal

¶ 59    First, defendants contend that the circuit court's judgment in favor of intervening plaintiffs must be reversed because the derivative claims were time-barred by the applicable statute of limitations period. Before proceeding to the merits, however, we must address the

parties' flagrant disregard for the Illinois Supreme Court Rules, which are mandatory, not optional. *Miller v. Lawrence*, 2016 IL App (1st) 142051, ¶ 18. Defendants' opening brief, consisting of over 74 pages, violates Illinois Supreme Court Rule 341(b)(1) (eff. Oct. 1, 2020), which provides that "[t]he brief of appellant[s] *** shall *** be limited to 50 pages." Defendants did not get leave of court to submit their brief in excess of the specific page limitation set forth under that rule.

¶ 60    Defendants are not alone in this regard as intervening plaintiffs' brief likewise violates Rule 341(b)(1) because it consists of 115 pages, well more than the 80 pages they were allowed to submit as appellees and cross-appellants.[10] See Ill. S. Ct. R. 341(b)(1) (noting that cross-appellants' briefs are limited to 80 pages). Moreover, intervening plaintiffs' reply brief contains 34 pages, well more than what they were allowed to submit pursuant to Rule 341(b)(1). See *id.* (noting that "cross-appellant[s'] reply brief shall not exceed 20 pages"). Like defendants, intervening plaintiffs failed to obtain leave of court to submit their briefs in excess of the page limitations. While we certainly could strike these additional pages, and do not condone these blatant rule violations, we will nevertheless proceed to consider the merits of this appeal and cross-appeal. That being said, we strongly advise counsel for all parties to refrain from such noncompliance going forward.

¶ 61                                  1. Statute of limitations and discovery rule

¶ 62    Pursuant to section 13-205 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/13-205 (West 2014)), claims for breach of fiduciary duty must be brought "within 5 years *** after the cause of action accrued." 735 ILCS 5/13-205; see also *Fuller Family Holdings, LLC v.*

---

[10]We note that all parties in their briefs have cited federal and out-of-state caselaw. The issues before us on appeal, however, are not novel issues where we need to look to other nonbinding state law and/or guidance; thus, we will not address those cases here.

*Northern Trust Co.*, 371 Ill. App. 3d 605, 618 (2007). Under the discovery rule, which is applicable to breach of fiduciary claims and delays commencement of the five-year limitations period, the cause of action accrues, and the limitations period commences, when the plaintiffs knew or reasonably should have known of the injury and that it was wrongfully caused. *Fuller Family Holdings, LLC*, 371 Ill. App. 3d at 618. The question of when parties knew of their injury and that it was wrongfully caused is generally one of fact. *Id.* The question, however, may be determined as a matter of law when it is apparent from the undisputed facts that only one conclusion can be drawn. *Id.*; *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004). As the applicability of a statute of limitations to a cause of action presents a question of law, our review is *de novo*. See *Travelers Casualty & Surety Co. v. Bowman*, 229 Ill. 2d 461, 466 (2008) ("The applicability of a statute of limitations to a cause of action presents a legal question we review *de novo*.").

¶ 63    In the instant case, the circuit court noted that it was "undisputed that the [intervening plaintiffs'] claim [was] governed by the five-year statute of limitations" period. Defendants, however, argue that the statute of limitations period began to run when the transactions at issue occurred. According to defendants, this meant that the limitations period began when the bonds were purchased in 1992 for Bedford Park and 1994 for Broadview, respectively. Defendants argue that intervening plaintiffs, as limited partners, had "contemporaneous knowledge" of the transaction, as well as the ability and motivation to sue at that time.

¶ 64    Intervening plaintiffs, on the other hand, argue that the limitations period did not begin to run until at least 2003, when Munaretto was put on inquiry notice after he first learned that Pielet had filed a complaint stemming from defendants' alleged improprieties, and in 2004, when he

filed his own complaint after consulting with counsel. According to intervening plaintiffs, they were not on inquiry notice of the alleged injuries until that time. We agree.

¶ 65    A purchaser is placed on inquiry, or constructive, notice when that purchaser has knowledge of facts and circumstances that would cause a person of prudence to make further inquiry. *Stump v. Swanson Development Co., LLC*, 2014 IL App (3d) 110784, ¶ 104. "If that person does not investigate further, he or she will be charged with notice of any facts that may have been discovered by the inquiry." *Id*. In this case, Pielet filed her complaint in 2001 challenging transactions that occurred in 1992 (Bedford Park Developer Bonds) and in 1994 (Broadview Junior Bonds). Since the complaint was brought more than five years after the transactions it challenged occurred, the circuit court applied the discovery rule in finding that the claims were not time barred. Specifically, the court held that:

> "[Intervening] plaintiffs' claims [were] not barred by the statute of limitations.
> Mr. Munaretto was on inquiry notice of an injury in 2003, and not before, *** the
> evidence show[ed]. With the filing of Melissa Pielet's complaint, he learned of this, and
> he filed his own complaint in 2004, after consulting with counsel. The evidence is that -
> Ski (phonetic) was first on inquiry notice in 2004 and joined this case that year."

¶ 66    Defendants, nevertheless, assert that because the derivative claims belonged to the Limited Partnerships, not to the individual, nominal plaintiffs, the discovery rule did not apply since the Limited Partnerships were aware of defendants' alleged wrongdoing well before 2003. More specifically, defendants rely on the "adverse domination" doctrine, which creates a rebuttable presumption that the corporation does not know of the injury as long as it is controlled by the wrongdoing officers and directors. See *Shrock v. Ungaretti & Harris Ltd.*, 2019 IL App (1st) 181698, ¶ 73. That principle, however, may be rebutted by evidence that someone other

than the wrongdoing directors had knowledge of the cause of action and both the ability and motivation to sue. *Id.* ¶ 77.

¶ 67    Here, the circuit court held that the presumption was not rebutted because "the limited partners of TB and [I.B.P.] were not agents of the limited partnerships or other limited partners." In other words, in order to impute knowledge from one limited partner to another, the law requires a duty to disclose which typically arises from an agent-principal relationship. *Cf. Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 86 (1999) (noting that "[w]hen the plaintiff is a corporation, it can only learn that it has been injured through its agents"); *Shrock*, 2019 IL App (1st) 181698, ¶ 78 (holding that the presumption was rebutted where the LLC plaintiffs clearly had knowledge of the firm's wrongdoing based on earlier litigation in which they repeatedly accused the attorneys of wrongdoing that harmed the LLC).[11] And in this case, intervening plaintiffs were not agents of the Limited Partnerships or of other limited partners. Thus, we cannot say that the lower court erred in applying the discovery rule to intervening plaintiffs' claims.

¶ 68                                   2. Statute of Repose

¶ 69    Defendants assert that, even if the discovery rule applied, the derivative claims were barred by the Illinois Securities Act's five-year statute of repose.

¶ 70    Intervening plaintiffs respond that defendants are estopped from challenging the applicability of the Illinois Securities Act's statute of repose because defendants failed to raise the issue at trial or in their motion for a directed finding, thereby forfeiting review of that issue. While intervening plaintiffs admit that defendants mentioned the statute of repose in their answer to intervening plaintiffs' amended complaints, intervening plaintiffs assert that defendants did

---

[11]Neither *Larney* nor *Schrock* involved a derivative action.

nothing more than set forth general, conclusory allegations which are insufficient to overcome forfeiture of the issue on appeal. In any event, intervening plaintiffs assert that defendants' repeated position that section 13-205's statute of limitations applied to the derivative claims is inconsistent with their new argument that the Illinois Securities Act's five-year statute of repose applies to those claims. Intervening plaintiffs further assert that, even if we conclude that defendants' argument is not forfeited, the argument is still meritless because the Illinois Securities Act does not provide relief for the derivative claims at issue in this case.

¶ 71    Statutes of limitation and repose encourage litigants to be diligent in bringing an action. *Sundance Homes, Inc. v. County of DuPage*, 195 Ill. 2d 257, 265-66 (2001). Stated differently, "[s]tatutes of limitation and repose represent society's recognition that predictability and finality are desirable, indeed dispensable, elements of the orderly administration of justice that must be balanced against the right of every citizen to seek redress for a legal recognized wrong." *Id*. at 266 (citing *Sepmeyer v. Holman*, 162 Ill. 2d 249, 256 (1994)). In Illinois, a statute of limitations begins to run when facts exist authorizing parties to maintain an action against other parties. *Id*.

¶ 72    Additionally, Illinois Securities Law (ISL) aims to protect "innocent persons who might be induced to invest their money in speculative enterprises over which they have little control." (Internal quotation marks omitted.) *Carpenter v. Exelon Enterprises Co., LLC*, 399 Ill. App. 3d 330, 334 (2010). "As such, the only civil remedy originally provided by the law was the right of rescission found in subsection 13(A), a right that is notably available only to the *purchaser* of a security." *Id*. at 337 (citing 815 ILCS 5/13(A) (West 2008)). Simply put, it is well settled that the remedies under that law are available *only to purchasers* of securities. *Id*. Courts construe the law liberally to better protect the public from deceit and fraud in securities sales. *Id*. at 334.

¶ 73    At the time of the transactions at issue, the ISL provided that "[no] action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this section," after five years from the sale of the securities at issue. 815 ILCS 5/13(D); see also *First National Bank & Trust Co. of Rochelle, Illinois v. McGraw-Hill Companies, Inc.*, 85 F. Supp. 3d 963, 967 (N.D. Ill. 2015). We note that section 13 of the ISL now sets forth a three-year timeframe for such actions to be brought. 815 ILCS 5/13(D) (West 2014). Section 13 of the ISL, however, "simply does not concern retroactive common law damages claims for breach of fiduciary duty brought by sellers of securities in general, or minority shareholders in particular." *Carpenter*, 399 Ill. App. 3d at 341. Consequently, neither the five nor three-year limitations periods contained in section 13(D) apply to intervening plaintiffs' derivative claims against defendants since those claims sought damages for defendants' alleged breach of their fiduciary duties and were brought by sellers, not purchasers, of securities. Because section 13(D) does not apply, we need not address intervening plaintiffs' forfeiture arguments.

¶ 74                                    3. Standing of intervening plaintiffs

¶ 75    Next, defendants present their oft-repeated standing argument, asserting that intervening plaintiffs' individual receipt of the $2.4 million from the Shaffer settlement deprived intervening plaintiffs of standing because they were required under Illinois law to remit those funds to the Limited Partnerships. According to defendants, intervening plaintiffs' "personal acceptance" of the Shaffer settlement funds eliminated the indirect injury that was the basis of their derivative standing and also "created, or exacerbated," a conflict between the intervening plaintiffs and the Limited Partnerships which they were representing.

¶ 76    Intervening plaintiffs respond that defendants have forfeited and/or are judicially estopped from challenging intervening plaintiffs' standing based on their receipt of the Shaffer settlement funds. Specifically, intervening plaintiffs assert that, although defendants initially objected to the Shaffer settlement, they later withdrew that objection after Shaffer transferred all his partnership interests to them. Even though defendants did so "without waiving the assertion of the arguments set forth therein as to all other aspects of this lawsuit, including but not limited to *** the summary judgment proceedings and trial," defendants could not have expressly waived their objections to the settlement while at the same time disclaiming that waiver. Intervening plaintiffs further assert that defendants are not challenging the lower court's actual entry of the Shaffer settlement, thereby forfeiting review of the issue on appeal. Forfeiture aside, intervening plaintiffs assert that defendants' standing arguments are meritless. We agree.

¶ 77    Initially, defendants are appealing whether the effect of the Shaffer settlement deprived intervening plaintiffs of standing, not the settlement agreement itself. We therefore cannot say that defendants have forfeited review of the issue. Additionally, to that end, "[s]tanding is not a procedural technicality, but rather is an aspect or component of justiciability." (Internal quotation marks omitted.) *Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 55. Thus, even if defendants forfeited the affirmative defense of standing, we still must determine whether intervening plaintiffs were allowed to have the court decide the merits of the dispute in this case. See *id.*

¶ 78    The purpose behind the standing doctrine is to ensure that courts decide actual controversies, rather than abstract questions. *Scrementi v. Wilcox*, 2021 IL App (1st) 210238, ¶ 17. As such, standing requires " 'some injury in fact to a legal cognizable interest." ' *Id.* (citing *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). The issue of

standing is a question of law, which we review *de novo*. *Scrementi*, 2021 IL App (1st) 210238, ¶ 17.

¶ 79    Additionally, and relevant to our analysis here, section 1003 of the Illinois Limited Partnership Act provides that "[a] derivative action may be maintained only by a person that is a partner at the time the action is commenced and: (1) that was a partner when the conduct giving rise to the action occurred; or (2) whose status as a partner devolved upon the person by operation of law or pursuant to the terms of the partnership agreement from a person that was a partner at the time of the conduct." 805 ILCS 215/1003 (West 2014).

¶ 80    Here, intervening plaintiffs satisfy both prongs as they were limited partners when defendants' alleged wrongdoing occurred and when Pielet first initiated the action against defendants in 2001. While defendants now claim that intervening plaintiffs' receipt of the Shaffer settlement deprived them of standing because the settlement funds belonged to the Limited Partnerships, this misconstrues the lower court's ruling. As set forth, the court below agreed that the proceeds from the settlement belonged to the Limited Partnerships. In the interest of judicial economy, however, the court simply set off those proceeds from intervening plaintiffs' individual awards from the derivative judgments, which resulted in little or no distribution to intervening plaintiffs due to the setoff.

¶ 81    Moreover, intervening plaintiffs would have received the Shaffer settlement proceeds regardless based on their *pro rata* ownership shares in the Limited Partnerships. The fact that the court prevented unnecessary litigation by removing a step that would have resulted in the same outcome did not deprive intervening plaintiffs of standing. Defendants' standing argument presents nothing more than yet another attempt to avoid accountability for their own actions by

trying to remove intervening plaintiffs from this litigation due to, in large part, a situation that defendants themselves created.

¶ 82                                    4. Law-of-the-case doctrine

¶ 83     Defendants, nonetheless, assert they were precluded from presenting a "full defense" to intervening plaintiffs' standing because the lower court misapplied the law-of-the-case doctrine when it determined that defendants could not pursue "*any* standing defenses on summary judgment or at trial" based on this court's prior ruling in *Pielet v. Hiffman*, 407 Ill. App. 3d 788, 797 (2011).

¶ 84     It is well settled that the law-of-the-case doctrine precludes "relitigation of a previously-decided issue in the same case and applies not only to the court's explicit decisions, but also those issues decided by necessary implication." *CE Design Ltd. v. C&T Pizza, Inc.*, 2020 IL App (1st) 181795, ¶ 32. Additionally, the doctrine applies to questions of law on remand and, as relevant here, to subsequent appeals to the appellate court. *Id*. Two exceptions to the doctrine arise when a higher court makes a contrary ruling on the same issue and when a reviewing court finds that its prior decision was "palpably erroneous." *Id*. A ruling is not binding in a subsequent stage of litigation, however, if different issues or parties are involved, or if the underlying facts have changed. *Id*. Finally, because application of the doctrine presents a question of law, our review is *de novo*.

¶ 85     Here, defendants argue that the lower court misapplied the doctrine because a lack-of-standing defense can be presented at any time, and furthermore, the facts in this case did not remain the same following remand. We disagree.

¶ 86     First, as set forth, intervening plaintiffs had standing to pursue the derivative claims in this case. Second, we reiterate that in *Pielet*, we held that intervening plaintiffs had standing to

pursue their claims based on principles of equity because defendants did not act in good faith in repurchasing the partnership interests and subsequently raising their standing defense, incidentally, more than eight years after the litigation in this matter had begun:

> "The motivation behind the exercise of that right was not to buy back interests of limited partners no longer associated with HSA, but primarily to simply remove intervenors' standing. Doing so is an exercise of discretion that was utilized in a manner inconsistent with the parties' reasonable expectations. While we acknowledge that repurchase options may legitimately serve a variety of purposes, they cannot operate to remove a party's standing under circumstances like those in the case *sub judice*." *Pielet*, 407 Ill. App. 3d at 799.

¶ 87    On remand, defendants raised standing defenses based on forfeiture and the repurchases of intervening plaintiffs' interests stemming from the 2004 capital call, both of which the circuit court rejected. Specifically, the court found that:

> "While some evidence exists that the general partners could substantiate the need for a capital call, the evidence clearly demonstrates that the capital call was intended to be used and was, in fact, used as leverage by the general partners, TB's trustees, to compel the TB limited partners to settle their claims against the general partners after the filing of Melissa Pielet's lawsuit."

The court further found that:

> "The evidence further demonstrates that the general partners, acting through Mr. Collins, had a high degree of confidence that Mr. Collins would be successful, as he was, in his efforts to negotiate agreements and renegotiate agreements to forebear on the foreclosure from LaSalle Bank, I believe, and to renegotiate the LaSalle first loan and the

First Bank's mezzanine loan. None of this was disclosed to the limited partners or known to them at the time that they had to decide filing for the second capital call. Per the uncontradicted testimony of the [intervening] plaintiffs' limited partners, had they known this, the evidence was that they would have paid their share of the capital call and not forfeited their positions as limited partners in the TB Limited Partnership. *** For this reason, the TB [intervening] plaintiffs' interests in TB are restored, and they are placed in the same position that they would have been had they been given all the proper information to have made an intelligent and knowing decision whether to pay and answer the capital call. It's as if they have never lost those interests. Each [intervening] plaintiff credibly said he would have made the capital call."

¶ 88    We agree with the lower court's findings. Moreover, defendants have not developed any relevant, legal arguments to support their standing claim. And even if they had, our prior ruling that defendants' motivation behind the capital call was simply to remove intervening plaintiffs' standing still applies here. Defendants' attempt to relitigate this issue is not lost on us and we find no error in the lower court's ruling reaching the same conclusion.

¶ 89                          5. Tax Gross-up amounts

¶ 90    Defendants next argue that the circuit court's award of roughly $18 million in tax gross-up amounts is not supported by Illinois law. More specifically, the court added about $6 million to the award on the Bedford Park Developer Bonds claim, $5 million to the award on the 2001 Bedford Park Senior Bonds claim, and $7 million to the award on the Broadview Junior Bonds claim, for tax liabilities owed by intervening plaintiffs on distribution from the derivative awards. According to defendants, those damages were erroneous because "Illinois law does not allow damages awards to be adjusted based on tax consequences" and "the damages conflict with

the derivative nature of the awards and the fact that I.B.P. and TB are pass-through entities that do not pay income tax."

¶ 91    In response, intervening plaintiffs assert that the lower court's award is supported by "a basic tenet of Illinois law: compensatory damages." In other words, a tax gross-up was properly included in the court's damages calculation because defendants' breach of fiduciary duties caused an adverse tax consequence for the Limited Partnerships in this case. We agree.

¶ 92    It is well settled that compensatory damages are paid to a person as compensation for a loss or injury. *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d 490, 497-98 (2000). Additionally, compensatory damages are "[d]amages sufficient in amount to indemnify the injured person for the loss suffered." (Internal quotation marks omitted.) *Id*. at 497. While the amount of recoverable damages is a question of law for the trier of fact, the measure of damages upon which the trier of fact's computation is based presents a question of law, which we review *de novo*. *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 60.

¶ 93    In the instant case, the circuit court found that tax gross-up damages were appropriate because intervening plaintiffs were harmed financially as a result of defendants' wrongdoing. Moreover, intervening plaintiffs would have gotten a tax-free benefit had defendants not breached their fiduciary duties: "Well, these 1.92 percent owners would have gotten a benefit. They would have gotten a tax-free payment. They didn't get the tax-free payment, Why? It was stolen from them." The court went on: "in order to compensate [intervening plaintiffs], they have to get the same money they would have got[ten], but it's no longer tax-free. They're going to have to pay taxes on it. [Intervening plaintiffs] thus derived a consequence of the stealing or the lack of giving the benefit thereof of the bonds." The court concluded: "[s]o to make [intervening plaintiffs] whole, to even it up, to be fair, they should get the money that they're going to have to

pay taxes on now where they wouldn't have had to pay taxes earlier. And who should pay that? The people who took the money from them."

¶ 94    Notably, defendants' own expert, Brian Whitlock, conceded that a tax gross-up, under the circumstances in this case, was appropriate. When asked if a tax gross-up is "appropriate if a taxpayer is subject to taxation of a litigation award at a higher rate than would have been applied to the underlying payment for which the litigation award is intended to compensate," Mr. Whitlock responded that it was appropriate. Additionally, when asked if the litigation award to intervening plaintiffs in this case, which was a restitution from defendants of what they diverted from the partnership that was not tax free, Mr. Whitlock answered, "If the payment is not tax-free, *** then it would have to be grossed up." As set forth, the payments awarded to intervening plaintiffs in this case were not tax-free.

¶ 95    The foregoing shows that intervening plaintiffs suffered financial loss solely due to defendants' wrongdoing. Consequently, intervening plaintiffs were entitled to an amount of damages sufficient to cover their losses, which, in this case, included a tax gross-up award for the reasons stated by the court below. Accordingly, we find no error in the circuit court's imposition of a tax gross-up award in this case.[12]

¶ 96                        6. Attorney fees and common fund doctrine

¶ 97    Defendants also take issue with the circuit court's award of attorney fees in this case, asserting the court's award of roughly $15.8 million in attorney fees, in addition to the $1.6 million that counsel received from the Shaffer settlement, must be reversed because the $15.8

---

[12]To the extent defendants argue that the tax gross-up award was inappropriate because it compensated individuals, rather than the Limited Partnerships, this ignores that the Limited Partnerships were themselves deprived of tax-free interest payments, which, consequently and negatively, affected *pro rata* distributions to the individuals.

million award was based on a misapplication of the common fund doctrine and was also unreasonable.

¶ 98     Under Illinois law, prevailing parties are generally responsible for the costs of litigation, absent a statutory provision or agreement between the parties. *Wajnberg v. Wunglueck*, 2011 IL App (2d) 110190, ¶ 17. The common fund doctrine is an exception to that general rule and provides that a litigant or attorney, who recovers a common fund for the benefit of individuals other than himself or his clients, is entitled to reasonable attorney fees from the fund. *Wendling v. Southern Illinois Hospital Services*, 242 Ill. 2d 261, 265 (2011); see also *Moruzzi v. CCC Services, Inc.*, 2020 IL App (2d) 190411, ¶ 30. "Underlying the doctrine is the equitable concept that the beneficiaries of the fund will be unjustly enriched by the lawyer's services unless those beneficiaries contribute to the costs of the litigation." *Moruzzi*, 2020 IL App (2d) 190411, ¶ 30.

¶ 99     Whether the doctrine applies is a question of law, which we review *de novo*. *Id*. ¶ 31. We review whether the circuit court's award of attorney fees was reasonable, on the other hand, for an abuse of discretion, which occurs only when the court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *900 North Rush LLC v. Intermix Holdco, Inc.*, 2019 IL App (1st) 181914, ¶ 41; *Norman v. U.S. Bank National Association as Trustee for Structured Asset Mortgage Investments II, Inc.*, 2020 IL App (1st) 190765, ¶ 36. It is important to note that, "[e]ven where the [circuit] court has, in its calculations, included improper fees or excluded recoverable fees, this court will not disturb the judgment unless the total fees and costs awarded *** was [so excessive or] so inadequate as to amount to a clear abuse of discretion ***." (Internal quotation marks omitted.) *Norman*, 2020 IL App (1st) 190765, ¶ 36.

¶ 100    To be entitled to fees under the doctrine, derivative counsel here had to show that (1) the fund was created as a result of his services, (2) defendants did not participate in the creation of the fund, and that (3) defendants benefited or will benefit from the fund's creation. *Moruzzi*, 2020 IL App (2d) 190411, ¶ 31. Furthermore, in determining whether the lower court's award of attorney fees was reasonable, courts consider, among other things, the following relevant factors: (1) the skill and standing of the attorney employed, (2) the nature of the cause and the novelty and difficulty of the questions at issue, (3) the amount and importance of the subject matter, (4) the degree of responsibility involved in the management of the cause, (5) the time and labor required, (6) the usual and customary charge in the community, (6) and the benefits resulting to the client. *Intermix Holdco, Inc.*, 2019 IL App (1st) 181914, ¶ 41.

¶ 101    As set forth, the circuit court held that the common fund doctrine applied in this case. Specifically, the court first found that:

> "It is undisputed that [Intervening] Plaintiffs' claims are derivative and that any recovery on those claims must be paid directly to TB and [I.B.P.]. TB and [I.B.P.] would then pay out that recovery to the limited partners according to their ownership shares."

The court continued, finding that:

> "Contrary to Defendants' assertions, this is a case where the common fund doctrine would apply. Any recovery made on [Intervening] Plaintiffs' claims will belong to [I.B.P.] and TB thereby creating a common fund to the benefit of every partner. Furthermore, any recovery of attorney's fees under the common fund doctrine would not be limited by [Intervening] Plaintiffs' percentage of ownership in [I.B.P.] or TB."

¶ 102    We agree with the lower court's ruling and conclude that derivative counsel satisfied all three prongs such that the common fund doctrine applied in this case. It is undisputed that the

fund was created as a result of derivative counsel's services since the fund was created after derivative counsel successfully litigated the derivative claims against defendants in this case and that defendants did not participate in the creation of that fund. Third, as the circuit court correctly found, defendants, as general partners of the Limited Partnerships, will benefit from the fund's creations as they will receive their *pro rata* shares of the derivative awards. In other words, defendants benefitted from derivative counsel's work since they will receive portions of the over $87 million derivative judgment, despite their wrongdoing, an issue that will be addressed in greater detail below.[13] Accordingly, we conclude that the lower court did not err in applying the common fund doctrine in this case.

¶ 103  We also cannot say that the circuit court's award of attorney fees in this case amounted to an abuse of discretion. Here, as set forth, the court below awarded derivative counsel "a fee equal to twenty percent (20%) of the total $87,325,788 common fund created through their efforts, less the $1.6 million that they received through the Shaffer settlement. This resulted in a total fee award of $15,865,157.60.

¶ 104  While defendants assert that the court should have used the lodestar method to calculate fees, rather than the common fund doctrine, this decision was within the sound discretion of the circuit court and defendants have not shown that the court's decision was arbitrary, fanciful, or unreasonable, or that no reasonable person would take the view adopted by the court. Rather, defendants have simply relied on a case that found the lodestar method to be "the most useful

---

[13]To the extent defendants assert that derivative counsel's fee award violates the common fund doctrine because he "was fully compensated by the $1,600,000 fee he collected through the Shaffer Settlement," this ignores that derivative counsel has not yet been compensated for all the work he performed in successfully obtaining the derivative judgment on behalf of the Limited Partnerships. *Cf. Parente & Norem, P.C. v. Chicago Regional Council of Carpenters Welfare Fund*, 2021 IL App (1st) 200340, ¶ 26 (where the appellant-law firm had already been fully compensated, the court held that common doctrine did not support the appellant-law firm's claim for additional fees).

starting point for determining the amount of a reasonable fee." *Aliano v. Transform SR LLC*, 2020 IL App (1st) 172325, ¶ 31. The fact that the circuit court here chose to apply the common fund doctrine instead does not alone establish an abuse of discretion.

¶ 105   Moreover, as defendants admit in their brief, an important consideration in determining the reasonableness of attorney fees is the number of hours reasonably expended by counsel. As set forth, this extensive litigation has been going on for more than two decades and involves complex facts and legal issues, which is evident by the record consisting of over a hundred thousand pages. The record reflects that the lower court considered those relevant factors, among others, in calculating derivative counsel's fee award. Regardless, defendants have fallen manifestly short of meeting their burden of showing the circuit court abused its discretion in awarding derivative counsel roughly $15.8 million simply because they disagreed with the court's chosen method for calculating fees.

¶ 106                      B. Intervening plaintiffs' cross-appeal

¶ 107          1. Whether defendants had a right to share in the compensatory damages awards

¶ 108   We now turn to intervening plaintiffs' cross-appeal. First, intervening plaintiffs argue that the circuit court erred in finding that defendants, as general partners of the Limited Partnerships, had an absolute right to share in the compensatory damages award to those partnerships because defendants should not benefit from their own breaches of fiduciary duty. Simply put, intervening plaintiffs argue that fiduciaries should not benefit from their own wrongdoing.

¶ 109   Defendants respond that intervening plaintiffs' cross-appeal must be dismissed because they are not proper cross-appellants. Specifically, defendants assert that intervening plaintiffs' acceptance of payments "to satisfy the amounts awarded to them bars them from challenging any portion of the judgment." Even if intervening plaintiffs are proper cross-appellants, defendants

assert they are still entitled to share in the *pro rata* distributions from any amounts collected on the derivative judgments because those judgments belonged to the Limited Partnerships, not to any individual parties. Additionally, denying defendants their *pro rata* distributions would result in a "windfall of roughly thirty to fifty times" intervening plaintiffs' *pro rata* shares, and furthermore, defendants' ownership interests in the Limited Partnerships were obtained through assignment.

¶ 110   First, we reject defendants' claim that intervening plaintiffs are not proper cross-appellants. Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017) provides that "[a] notice of appeal may be filed by any party or by any attorney representing the party appealing, regardless of whether that attorney has filed an appearance in the circuit court case being appealed." Here, it is undisputed that derivative counsel filed the notice of cross-appeal on behalf of himself and intervening plaintiffs, who were parties to the action below and are parties to this appeal.

¶ 111   Additionally, to the extent defendants assert that intervening plaintiffs have forfeited their challenge to the derivative judgment because they "voluntarily accept[ed] the fruits" of that judgment, this ignores that intervening plaintiffs are challenging the *distribution* of the derivative judgment on behalf of the Limited Partnerships, not on behalf of the nominal individuals. *Cf. Davis v. Casey*, 361 Ill. App. 3d 658, 663 (2005) (unlike the cross-appellant in *David*, who sought relief that risked opening the entire judgment to reconsideration, including the amount the cross-appellant had already received, intervening plaintiffs here are only challenging the distribution of the derivative judgment, which does not in any event risk recovering less than the amount already collected). Finally, it bears noting that defendants' argument essentially sets forth the same standing challenge that we already rejected.

¶ 112 We now turn to the merits of intervening plaintiffs' argument that defendants should not be permitted to recover any portion of the derivative judgment because they should not benefit from their own misconduct.

¶ 113 As set forth, the circuit court held that "[d]efendants' alleged wrongdoing does not bar them from sharing in any compensatory damages awarded to TB and [I.B.P.]." In reaching this conclusion, the court found:

"[T]here is no wrongful conduct alleged on the part of any of the limited partners. As assignees of the limited partners, Shaffer, Hulina and Collins step into their shoes and acquire the same rights. (Citation omitted.) Therefore, regardless of their conduct, Shaffer, Hulina and Collins are entitled to recover any amounts which would be payable to the assignor limited partners. To the extent [intervening plaintiffs] attack the validity of the assignments, they are not a party to those assignments and lack standing to challenge the assignments. In the absence of any challenge to the assignment by the assignors, [d]efendants are entitled to enforce those assignments."

¶ 114 We agree with the lower court's ruling and its reasoning. Although intervening plaintiffs assert that because defendants breached their fiduciary duty, the court "should have prohibited them from benefiting from that breach by barring them from sharing as assignees in a recovery to TB and [I.B.P.]," this would allow intervening plaintiffs to take all of the damages suffered by the Limited Partnerships, thus resulting in a windfall to intervening plaintiffs. See, *e.g.*, *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 376-77 (1994) (holding that the limited owner who prevailed on derivative claims was only entitled to his *pro rata* share of the damages); *Tully v. McLean*, 409 Ill. App. 3d 659, 662-63 (2011) (similar).

¶ 115   We note that intervening plaintiffs rely on several cases involving, for example, direct (rather than derivative) claims, punitive damages, and otherwise distinguishable fact patterns that do not apply; thus, we will not address them here. We further note that intervening plaintiffs initially set forth a number of arguments as to why they believed the circuit court erred in awarding defendants a $550,000 setoff relating to the purchase of the Developer Bonds. Intervening plaintiffs, however, later withdrew those arguments in their cross-reply brief. Accordingly, we will not address them here.

¶ 116   2. Whether the lower court properly dismissed citations to discover assets against the Limited Partnerships

¶ 117   Next, intervening plaintiffs assert that the circuit court erred in dismissing, with prejudice, their citations to discover assets and in barring them from undertaking post-judgment collection proceedings to collect the derivative judgments on behalf of the Limited Partnerships. According to intervening plaintiffs, those rulings "foreclosed" creation of the common fund and "effectively voided" the derivative judgment and award of attorney fees to derivative counsel. We agree.

¶ 118   As previously set forth, after the final judgment was entered in this case, defendants failed to post an appropriate appeal bond, leading intervening plaintiffs to initiate post-judgment collection proceedings. In attempting to collect the judgments, intervening plaintiffs filed citations to discover assets in the name of the Limited Partnerships. The citations were issued to, among others, Collins Interests, Ltd., Hulina, LLC, Hulina Family, LLC, and Sunshine Bond. The citations were also issued to defendants' attorneys and third parties, Thompson Coburn, LLP, Ice Miller, LLP, Locke Lord, LLP, and Tabet DiVito & Rothstein, LLC. The circuit court ultimately granted the request of those third parties and the Limited Partnerships to quash the

citations to discover assets. The court also barred intervening plaintiffs and derivative counsel from undertaking post-judgment collection proceedings to collect the derivative judgment on behalf of or in the name of the Limited Partnerships.

¶ 119   The court's decision to quash the citations to discover assets was based on its conclusion that intervening plaintiffs lacked standing to issue the citations because the individual awards entered in their favor on their direct claims had already been satisfied in full and the derivative portions of the judgment "and any potential right to seeking enforcement of those portions of the [j]udgment belong[ed] solely to" the Limited Partnerships; thus, "there [were] no pending amounts to award on the [j]udgment and consequently no basis for [intervening plaintiffs] to pursue post-judgment proceedings." The court further held that derivative counsel was not entitled to pursue a claim for attorney fees "through [intervening plaintiffs'] status as nominal plaintiffs."

¶ 120   These rulings, however, misconstrue that intervening plaintiffs issued the citations to discover assets *in the name of the Limited Partnerships*, not themselves, and that derivative counsel's attorney fees were awarded under the common fund doctrine, which applies where, as here, an attorney recovers a common fund for the *benefit of individuals other than himself or his clients*. *Wendling*, 242 Ill. 2d at 265; see also *Moruzzi*, 2020 IL App (2d) 190411, ¶ 30. Stated differently, derivative counsel's fee award in this case was based on the fact that he conferred a benefit on the Limited Partnerships, *not* on the nominal plaintiffs, when he obtained the derivative judgment for those partnerships. If derivative counsel is unable to collect his fee award, defendants would unfairly benefit from his work since they share in the derivative recovery as general partners of the Limited Partnerships, as set forth above. Accordingly, we conclude that the circuit court erred in dismissing the citations to discover assets in this case.

¶ 121   As a final matter, intervening plaintiffs ask this court to enter an order finding that defendants' agreement regarding derivative recovery is void and that we enter judgment against defendants for punitive damages. Intervening plaintiffs, however, have not set forth any basis for us to enter such orders nor have they developed any legal argument to support their requested relief. Instead, intervening plaintiffs simply presented their requests, in a conclusory fashion, at the end of their brief. Because this court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented and is not a repository into which parties may foist the burden of argument and research, we will not entertain those requests here and decline to enter their requested order and judgment concerning defendants' derivative recovery agreement and punitive damages. See *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises*, 2013 IL 115106, ¶ 56 (noting that "a reviewing court is not simply a depository into which a party may dump the burden of argument and research").

¶ 122                                  III. CONCLUSION

¶ 123   For the reasons set forth above, we affirm the circuit court's final judgment and award of attorney fees in this case. Additionally, we reverse the court's May 13, 2022, order dismissing intervening plaintiffs' citations to discover assets. We remand with directions for the lower court to grant the citations to discover assets and allow intervening plaintiffs to proceed with post-judgment collection proceedings.

¶ 124   Affirmed in part and reversed in part; cause remanded with directions.